IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **BLACKBERRY CORPORATION,** | : | CIVIL ACTION NO. 1:21-CV-119 |
| | : | |
| Plaintiff | : | (Judge Conner) |
| | : | |
| v. | : | |
| | : | |
| **BRADLEY FILIPOVICH,** | : | |
| | : | |
| Defendant | : | |

### MEMORANDUM

Plaintiff BlackBerry Corporation ("BlackBerry") moves for a preliminary injunction against its former employee, defendant Bradley Filipovich.  BlackBerry asks the court to enjoin Filipovich from perceived violations of the confidentiality, nonsolicitation, and noncompetition clauses in his employment agreement.  For the reasons that follow, we will deny BlackBerry's motion.

**I.   Background**

BlackBerry commenced this action with the filing of a verified complaint alleging one count of breach of contract by Filipovich.  (See Doc. 1).  BlackBerry contemporaneously moved for preliminary injunctive relief pending resolution of the breach-of-contract claim.  (See Doc. 2).  Following a brief period of expedited discovery, we convened a preliminary injunction hearing on February 23, 2021.  BlackBerry's motion is fully briefed and ripe for disposition.

## II. <u>**Findings of Fact**</u>[1]

BlackBerry is an international "software company specializing in enterprise software, internet of things (IoT) and cyber security." (See Doc. 1 ¶ 7). Filipovich began working for BlackBerry around July 30, 2019, as an Enterprise Sales Manager from his home office in Carlisle, Pennsylvania. (See id. ¶¶ 3, 10). Filipovich brought with him over two decades of experience in information technology ("IT") sales and management. (See Doc. 40-4; Doc. 40-7 ¶ 3). He has worked in IT sales in Pennsylvania since 2004. (See Doc. 40-4 at 1, 2). Filipovich was assigned to BlackBerry's customer base referred to as "SLED – State, Local (government) and Education." (See Doc. 1 ¶ 12). According to the complaint, his sales territory included Pennsylvania, West Virginia, Ohio, New Jersey, and Maryland.[2] (See id.) Filipovich was responsible for "cultivating, developing, and maintaining business with state and local government customers and prospective customers" as well as "marketing and selling BlackBerry's goods and services." (See id. ¶¶ 11, 12).

Filipovich signed an employment agreement as a condition of his start at BlackBerry. (See Doc. 40-3). The agreement includes confidentiality limitations as well as noncompetition and nonsolicitation clauses. (See id.) Specifically, the

---

[1] Consistent with the directive of Federal Rule of Civil Procedure 65(d), the following factual narrative represents the court's findings of fact as derived from the record.

[2] Filipovich claims his territory actually covered Pennsylvania, New Jersey, Maryland, Delaware, and New York. (See Doc. 30 at 3). He denies that his territory included Ohio or West Virginia. (See Doc. 32 ¶ 12; Doc. 40-7 ¶¶ 7-8).

agreement prohibits Filipovich from using or disclosing BlackBerry's confidential information, soliciting current or former BlackBerry employees to leave the company, or soliciting BlackBerry customers. (See id. at 6-7). The agreement further states that Filipovich may not

> own, operate, work for, be engaged by, advise, or provide any consulting, financial, technical, or other assistance or services to any undertaking that produces, markets, sells, or otherwise deals in any products or services that are competitive with or reasonably anticipated to be competitive with the products or services sold or supplied by BlackBerry, or that [Filipovich] should reasonably be aware that BlackBerry contemplated producing, marketing, licensing, or selling . . . that were developed, supported or serviced by [Filipovich] within the twelve (12) months preceding [his] last day of employment with BlackBerry.

(See id. at 7). Filipovich's nonsolicitation and noncompetition periods last for 12 months unless he is terminated without cause. (See id.) The noncompetition area extends to any geographic area "where BlackBerry does business that was developed, supported, or serviced by" Filipovich. (See id.)

While at BlackBerry, Filipovich's sales focused on two "endpoint" products—unified endpoint security ("UES") and unified endpoint management ("UEM") products. (See Doc. 1 ¶ 11; Doc. 40-1 at 13; Doc. 40-6 at 2). Filipovich testified that he sold BlackBerry Protect and BlackBerry Optics (packaged as BlackBerry Spark), which are considered UES products. (See Hr'g Tr. 75:14-76:13).[3]

---

[3] The court reporter has provided the court with a rough transcript of the February 23 hearing. Citations thereto are abbreviated "Hr'g Tr." Pagination of the rough draft may vary from pagination of the official transcript.

3

BlackBerry Protect is focused on prevention, and Blackberry Optics is focused on remediation if an IT infrastructure compromise occurs. (See id. at 4:12-5:6). BlackBerry promotional material for BlackBerry Protect claims the company "has redefined what an endpoint solution can and should do for organizations." (See Doc. 40-1 at 1). According to BlackBerry, this software is an "endpoint security solution" that "stops endpoint breaches." (See id. at 4, 8). The product is device-oriented, claiming to provide "complete protection for all devices and activation types" without "reliance on the end user." (See id. at 9). BlackBerry promotional material specifically names Proofpoint as a company whose "email data loss prevention" products can be "integrated with" BlackBerry products. (See Doc. 40-13 at 5).

Proofpoint, Inc. ("Proofpoint"), is a cybersecurity company. (See Doc. 30 at 5). Unlike BlackBerry, Proofpoint offers protection from "advanced email threats." (See Doc. 40-12 at 2). Proofpoint's "Email Protection" product uses a "secure email gateway" ("SEG") to scan emails and "prevent malicious content from reaching the servers." (See Doc. 40-7 ¶ 46). The Email Protection product does not involve software installed on individual devices; rather, it works at the "gateway" level to screen suspicious email. (See id. ¶¶ 46-50; Doc. 40-14). Proofpoint products work in tandem with endpoint protection, (see Doc. 40-12), and Proofpoint recommends its customers use both "endpoint" and "gateway" security, (see Doc. 40-14), commonly known as a "layered" approach to cybersecurity. It also advocates the use of endpoint and gateway products from different companies "to provide diversity and increase likelihood of detection." (See id.)

Scott Henderson is BlackBerry's Vice President of Sales for the Americas. (See Hr'g Tr. 3:7-3:12). He described the Blackberry Protect product in detail, and emphasized its purpose of providing comprehensive endpoint protection. (See generally Hr'g Tr. 4:12-11:22). At the same time, however, he stated it was not unusual for Blackberry customers to request a multi-layered approach involving both endpoint and SEG protection. (See id. at 20:20-21:21). Henderson opined that he considered BlackBerry and Proofpoint competitors because both companies develop products "to solve the same problems" in cyber security. (See id. at 42:16-42:23). Yet, he confirmed that: (1) the products from these companies can be used in tandem, and (2) BlackBerry does not sell an SEG. (See id. at 43:2-43:19, 55:10-55:19). Perhaps most significantly, Henderson acknowledged that <u>BlackBerry has a contract with Proofpoint for their email protection</u>. (See id. at 21:22-21:24, 52:22-53:13). In other words, Blackberry, like many of its customers, actually utilizes the product of Blackberry's alleged competitor to complement its cyber security system.

Sometime before November 2020, a Proofpoint recruiter reached out to Filipovich via LinkedIn. (See Doc. 40-6 at 5). Filipovich responded on or about November 10, 2020. (Id.) Filipovich then interviewed with Jason Maass, Proofpoint's Vice President of Sales in the Public Sector for the United States. (See Doc. 40-11 at 20, 29). According to Maass, Filipovich was hired because of his "many, many years of selling" in Pennsylvania and his "extensive experience in the region." (See id. at 33, 35).

Prior to accepting employment with Proofpoint, Filipovich endeavored to learn whether Proofpoint was a competitor of BlackBerry. (See Doc. 40-7 ¶ 12; Hr'g Tr. 119:4-120:14). He researched an internal BlackBerry site that contained "competitive intelligence," and Proofpoint was not identified. (See Doc. 40-7 ¶¶ 13-16). Additionally, Filipovich read publications from Gartner, Inc., a "leader in the cyber security field," that did not list BlackBerry and Proofpoint as "competitors or alternatives to each other." (See id. ¶¶ 20-22; Doc. 40-6 at 11). Filipovich compared Gartner to the *Consumer Reports* for the IT sector during his testimony. (See Hr'g Tr. 70:22-71:13). Finally, Filipovich also used Proofpoint's products as a BlackBerry employee; as noted, BlackBerry uses Proofpoint's Email Protection product to protect employee email. (See id. at 119:21-120:1; Doc. 40-7 ¶¶ 17-18).

Filipovich worked for Blackberry for approximately 16 months before his departure on December 17, 2020. (See Hr'g Tr. at 89:20-89:22). He commenced his new role with Proofpoint on December 21, 2020. (See id. at 89:14-89:19). Upon starting with Proofpoint, Filipovich emailed several of his professional contacts to alert them to his change in employment. (See Docs. 40-8, 40-9). There is no indication in the record that the recipients of these emails were customers of BlackBerry. (See generally Hr'g Tr. 103:6-104:22). He did not download data, make copies of internal documents or otherwise attempt to misappropriate any trade secrets or intellectual property of any kind from his employer. (See Doc. 40-6 at 6-7). Indeed, Filipovich credibly testified that he attempted to depart on good terms. (See Hr'g Tr. at 118:25-120:14) (describing his efforts and noting that when he left BlackBerry, he tried to do so "on the up and up the entire time").

When Filipovich tendered his resignation, his then-supervisor Marc Doniger sent a short email to Henderson stating that Filipovich was leaving for Proofpoint, "a competitor." (See Doc. 40-2 at 1-2). Doniger did not inform Filipovich that Doniger considered Proofpoint a competitor to BlackBerry. (See Hr'g Tr. 91:14-92:16). Moreover, Doniger's deposition confirms he was not familiar with Proofpoint. (See Doc. 40-10 at 16). He only visited its website and, "based upon a 30,000-foot view," he provided the competitor label to BlackBerry's human resources department. (See id. at 16-17). He did not conduct any other research into Proofpoint. (See id. at 22-24). Within a week of Filipovich's resignation, BlackBerry sent Filipovich and Proofpoint letters regarding the restrictive covenants in Filipovich's employment agreement. (See Docs. 1-3, 1-4). After receiving no response, BlackBerry commenced the instant litigation.

## III.   Legal Standard

A preliminary injunction is an extraordinary remedy and should issue only in limited circumstances. See Issa v. Sch. Dist. of Lancaster, 847 F.3d 121, 131 (3d Cir. 2017). The court applies a four-factor test in determining the propriety of preliminary injunctive relief. The movant must, as a threshold matter, establish the two "most critical" factors: likelihood of success on the merits and irreparable harm. Reilly v. City of Harrisburg, 858 F.3d 173, 179 (3d Cir. 2017). Under the first factor, the movant must show that "it can win on the merits." Id. This showing must be "significantly better than negligible but not necessarily more likely than not." Id. The second factor carries a slightly enhanced burden: the movant must establish that it is "more likely than not" to suffer irreparable harm absent the

requested relief.  Id.  Only if these "gateway factors" are satisfied may the court consider the third and fourth factors: the potential for harm to others if relief is granted, and whether the public interest favors injunctive relief.  Id. at 176, 179.  The court must then balance all four factors to determine, in its discretion, whether the circumstances favor injunctive relief.  Id. at 179.

**IV.    Discussion**

    **A.    Likelihood of Success on the Merits**

To establish a likelihood of success on the merits, a movant must produce sufficient evidence to satisfy the essential elements of the underlying cause of action.  See Punnett v. Carter, 621 F.2d 578, 582-83 (3d Cir. 1980).  We must examine the legal principles controlling the claim and the potential defenses available to the opposing party.  See BP Chems. Ltd. v. Formosa Chem. & Fibre Corp., 229 F.3d 254, 264 (3d Cir. 2000).  A mere possibility that the claim might be defeated does not preclude a finding of probable success if evidence clearly satisfies the essential prerequisites of the cause of action.  Highmark, Inc. v. UPMC Health Plan, Inc., 276 F.3d 160, 173 (3d Cir. 2001).  A showing that is "significantly better than negligible but not necessarily more likely than not" is sufficient to obtain preliminary injunctive relief.  Reilly, 858 F.3d at 179.  The requisite strength of a claim on the merits depends ultimately on the balance of the harms: "the more net harm an injunction can prevent, the weaker the plaintiff's claim on the merits can be while still supporting some preliminary relief."  Id.

    BlackBerry asserts a singular claim for breach of contract, alleging that Filipovich's employment with Proofpoint violates his employment agreement.  To

prevail on a claim for breach of contract under Pennsylvania law, a plaintiff must prove the following: (1) the existence of a contract, including its essential terms; (2) defendant's breach of duty imposed by the terms; and (3) actual loss or injury as a direct result of the breach.  See Ware v. Rodale Press, Inc., 322 F.3d 218, 225 (3d Cir. 2003) (quoting CoreStates Bank, N.A. v. Cutillo, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999)).  The parties' Rule 65 disputes center primarily on the second and third elements.  (See Docs. 3, 30).

Filipovich does not contest that he read and signed an employment agreement with BlackBerry or that the agreement contains noncompetition, nonsolicitation, and confidentiality clauses.  (See generally Doc. 32; Hr'g Tr. 58:4-64:16).[4]  He does dispute whether his employment with Proofpoint violates any of those clauses.  (See Doc. 30 at 10-18).  Ultimately, BlackBerry's motion fails on this threshold issue: it has not shown, at this stage, that Proofpoint is a competitor of BlackBerry.[5]

---

[4] While the existence of the contract is not substantially at issue at this juncture, Filipovich reserved the right to contest the enforceability of the contract. He claims "BlackBerry has no legitimate business interest that can be protected by forcing [Filipovich] to resign from Proofpoint" and that "BlackBerry improperly seeks to prevent [Filipovich] from earning a living in his chosen profession."  (See Doc. 32 ¶¶ 52-53).

[5] BlackBerry's complaint can be read to plead three theories of contract liability because it alleges that Filipovich has breached his contract with BlackBerry "by competing," but also alleges that Filipovich's competition will mean "inevitable wrongful use of BlackBerry confidential information and solicitation of BlackBerry's customers."  (See Doc. 1 ¶¶ 28, 34).  The preliminary injunction hearing, however, focused on Filipovich's alleged violation of the noncompetition clause.  We therefore confine our merits analysis to the noncompetition aspect of BlackBerry's claim.

Filipovich testified to the extensive research he conducted to ensure Proofpoint was not a competitor, and we find his testimony credible. (See generally Hr'g Tr. 118:25-126:15). Filipovich did not locate anything on either BlackBerry's internal site or a trusted third-party site indicating that the companies produce competing products. (See id. at 119:6-119:21). He also used Proofpoint's Email Protection product "daily" while employed at BlackBerry to check his employee spam folder. (See Doc. 40-7 ¶ 17; Hr'g Tr. 119:21-120:1).

Filipovich's testimony does not stand alone. Henderson's testimony on behalf of BlackBerry confirmed BlackBerry's own employees use Proofpoint products. (See Hr'g Tr. 21:22-21:24, 52:22-53:17). BlackBerry promotional material informs customers its products can be "integrated with" Proofpoint products. (See Doc. 40-13 at 5). It makes little sense for BlackBerry to recommend integration of its own product with that of a direct competitor. Furthermore, Filipovich's former BlackBerry supervisor performed nothing other than a cursory internet search to determine if the companies competed. (See Doc. 40-10 at 24-25). Simply put, the evidence before the court indicates that Filipovich now sells a product that is materially different from the product he sold at BlackBerry. The court finds that Proofpoint's product is complementary to, not competitive with, BlackBerry's product.

For the limited purpose of obtaining preliminary injunctive relief, the court concludes that BlackBerry has failed to provide sufficient evidence that Proofpoint is a competitor. Obviously, if Proofpoint is not a competitor, then Filipovich's employment with Proofpoint is not a breach of his employment agreement with

BlackBerry.  For these reasons, we find that BlackBerry has not adequately demonstrated a reasonable probability of success on the merits of its breach-of-contract claim.

### B. Irreparable Harm

Irreparable injury is harm of such an irreversible character that prospective judgment would be "inadequate" to make the moving party whole.  See Anderson v. Davila, 125 F.3d 148, 163 (3d Cir. 1997); Instant Air Freight Co. v. C.F. Air Freight, Inc., 882 F.2d 797, 801 (3d Cir. 1989).  Our court of appeals has emphasized that "the risk of irreparable harm must not be speculative."  Adams v. Freedom Forge Corp., 204 F.3d 475, 488 (3d Cir. 2000).  And a "showing of irreparable harm is insufficient if the harm will occur only in the indefinite future."  Campbell Soup Co. v. ConAgra, Inc., 977 F.2d 86, 91 (3d Cir. 1992).  Rather, the moving party must establish that the harm is imminent and probable.  Anderson, 125 F.3d at 164.  The required showings on irreparable harm and likelihood of success are correlative: thus, the weaker a plaintiff's merits showing, the more is required of the showing of irreparable harm, and vice versa.  See Reilly, 858 F.3d at 179 (quoting Hoosier Energy Rural Elec. Coop., Inc. v. John Hancock Life Ins. Co., 582 F.3d 721, 725 (7th Cir. 2009) (Easterbrook, J.)).

Our conclusion that BlackBerry has failed to demonstrate a likelihood of success on the merits means it must evince a greater showing of irreparable harm to obtain the extraordinary relief it seeks.  See Reilly, 858 F.3d at 179.  But even if we assume, *arguendo*, that BlackBerry *has* shown a reasonable likelihood of success on the merits, it has not shown irreparable harm that is imminent and probable to

warrant a preliminary injunction. See Anderson, 125 F.3d at 164. BlackBerry's irreparable harm argument is long on conjecture and short on proof: BlackBerry essentially claims that, because Filipovich is allegedly violating the noncompetition clause, he will "inevitably" breach the confidentiality and nonsolicitation clauses as well, and that money damages could not remedy those hypothetical harms. (See Doc. 3 at 13). Yet Filipovich testified that he retained no confidential information, client list, pricing, or other proprietary material from BlackBerry when he resigned, and BlackBerry provided no evidence to the contrary. Cf. Bimbo Bakeries USA, Inc. v. Botticella, 613 F.3d 102, 110-11 (3d. Cir. 2010) (injunction proper when there is a "substantial threat" of trade secret misappropriation). Nor has BlackBerry shown that Filipovich has in fact solicited clients or employees of BlackBerry or that he is working to do so.

The emails BlackBerry introduced to argue that Filipovich is actively working to steal BlackBerry's customers do not prove what BlackBerry thinks they do. The emails confirm only that Filipovich is a longtime salesman in Pennsylvania with his own, preexisting business contacts. (See Docs. 40-8, 40-9). For example, one email from Filipovich contains a subject line stating he has "[m]oved on *[a]gain*," indicating that Filipovich had developed this relationship prior to his employment with BlackBerry. (See Doc. 40-8 at 1 (emphasis added)). Filipovich stated he had sold to this customer before he was employed at BlackBerry. (See Hr'g Tr. 103:19-104:22). Another email begins with a congratulatory note from Filipovich because he understood the recipient was retiring. (See Doc. 40-9 at 1). Filipovich again confirmed he had sold the email recipient IT products before he

12

was employed at BlackBerry. (See Hr'g Tr. 103:4-103:14). Moreover, Proofpoint's representative stated that Filipovich was hired because of his decades-long experience in sales, rather than any information or client goodwill he had access to at BlackBerry. (See Doc. 40-11 at 33, 35). Finally, as we noted *supra*, the present record demonstrates that the two companies' products are complementary, not competing. See *supra* at 8-10. Thus, even if Filipovich *were* actively soliciting BlackBerry's customers on behalf of Proofpoint, BlackBerry has not shown how that conduct would cause it harm.

For these reasons, BlackBerry has failed to demonstrate any irreparable harm beyond its own speculation that Filipovich is competing in his new position at Proofpoint. Cf. Adams, 204 F.3d at 488. Instead, the record evidence indicates Filipovich is selling a product that is complementary to BlackBerry's products. At this juncture, BlackBerry has not shown how the sale of a complementary product is more likely than not to cause it irreparable harm. See Reilly, 858 F.3d at 179.

**C.     Remaining Factors**

BlackBerry has failed to establish the first two "gateway" factors, so we need not address whether Filipovich will suffer greater harm than that alleged by BlackBerry if injunctive relief is granted, or whether the public interest favors the requested relief. See Reilly, 858 F.3d at 176, 179. Nonetheless, we note that these factors, too, support denial of BlackBerry's motion. The harm to Filipovich in denying him the ability to earn a living and enjoining him from his chosen employment would be substantial. Cf. PharMethod Inc. v. Caserta, 382 F. App'x 214, 219-20 (3d Cir. 2010) (nonprecedential); (see Hr'g Tr. 131:12-132:6). Such harm

13

would be especially unwarranted where BlackBerry has not shown that Filipovich is gainfully employed with a competitor. And the public interest favors an employee such as Filipovich being free to work where he pleases when it does not offend his contract with BlackBerry. Cf. Fres-co Sys. USA, Inc. v. Hawkins, 690 F. App'x 72, 79-80 (3d Cir. 2017) (nonprecedential) (citing Bimbo Bakeries, 613 F.3d at 119). Given our conclusions *supra*, these remaining factors counsel against the imposition of a preliminary injunction as well.

## V. Conclusion

We do not find that the present circumstance warrants the extraordinary remedy of a preliminary injunction. See Issa, 847 F.3d at 131. We will therefore deny BlackBerry's motion (Doc. 2) for such relief. An appropriate order shall issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner
United States District Judge
Middle District of Pennsylvania

Dated: March 2, 2021